No. 1454.—FOSTER & MCALLISTER, Erwin's Executors, v. BANK OF NEW ORLEANS.

A deposit in the Bank of New Orleans in 1862, in checks and drafts, drawn by the Union Bank of Nashville, and by citizens of Tennessee, during the time that Confederate Treasury notes were shown to be bankable funds in New Orleans and Nashville, must be considered as having been made in such funds.

A depositor of funds in Confederate Treasury notes, while such notes were shown to be bankable funds, cannot recover, from the bank in money, the amount so deposited.

Where a party purchased checks drawn by one bank on another, and drafts drawn by one party on another, all within the Confederate lines at the time, and paid for them in Confederate Treasury notes, he must be considered as *particeps criminis* in giving credit to that currency, and is without the capacity to obtain the enforcement of any contract or obligation growing out of such transactions.

APPEAL from the Fourth District Court of New Orleans. *Theard, J. Breaux & Fenner*, for plaintiffs and appellees, *William H. Hunt* and *L. Castera*, for defendant and appellant.

TALIAFERRO, J. The plaintiffs as executors, the one of James Erwin, Sr., the other of James Erwin, Jr., bring this suit to recover from the Bank of New Orleans the sum of twenty thousand dollars with legal interest thereon from the twenty-seventh day of February, 1862. They allege that at that date the Bank received for account of the firm of James Erwin & Son, twenty thousand dollars, which it has failed to pay over or to account for.

The answer is a general denial. The defendant admits that it did receive about the twenty-fifth of February, 1862, from James Erwin & Son, two checks drawn upon it by the Merchants' Bank of Nashville, one for $3000, the other for $4000, and also four drafts amounting in the aggregate to $13,000, drawn upon William Conner & Co. The proceeds of the whole, making $20,000, they aver were placed on the books of the Bank to the credit of James Erwin & Son in funds then bankable, that is, in Confederate money which at that time they allege was the only currency used in commercial dealings in New Orleans. The defendant further sets out that from the circumstances under which the transactions took place between James Erwin & Son and the defendant, it was authorized to receive and pay back Confederate money to them which it has always been and is now willing to do. The defendant further pleads in bar of this action that the plaintiffs' pretended claim is based on a contract, the consideration of which was Confederate money, an illicit currency gotten up to sustain the late rebellion against the United States Government, and the contract being against public order and policy is null and void.

In the court below the plaintiffs had judgment for $20,000 with legal interest from the tenth of July, 1863. The defendant has appealed.

On the twentieth of December, 1861, James Erwin & Son, of Nashville, purchased from the Merchants' Bank of that place, two checks, one for $3000, the other for $4000, drawn on the Bank of New Orleans in the following form :

"$3000. Merchants' Bank, Nashville, Tenn.,
In Bankable funds,
Pay to the order of James Erwin three thousand dollars. To Bank of New Orleans, New Orleans, La.

II. C. SHAPARD, Cashier.

No. 9838."

The four checks or drafts on Conner & Son, were purchased by the Erwins in Nashville, from the Traders' Bank of that place, on the twentieth of December, 1861, and they, in like manner, with the checks upon the Bank of New Orleans bought at same date, were drawn payable in "bankable funds." Conner & Son in payment of the checks drawn upon them, gave their own check upon the Bank of New Orleans. Its amount was charged to Conner & Son, and passed to the credit of James Erwin & Son. The same thing was done in relation to the checks drawn by the Merchants' Bank of Nashville.

The plaintiffs argue that neither the checks upon the bank nor upon Conner & Son, were collected in Confederate money. That Confed-

erate money was not received for Erwin & Son, nor authorized to be received by them, and that nothing appears to connect the Erwins with any transaction in Confederate money throughout the whole business, that the Bank on receipt of the checks informed the holders, through its cashier, that it was in receipt of their letters of sixteenth and twenty-third of December, 1861, "with twenty thousand dollars, which as requested, have been placed to the credit of James Erwin & Son."

It is shown that at the time these several checks were purchased, and afterwards when their proceeds were placed to the credit of the Erwins, Confederate money was bankable funds both in Nashville and New Orleans; that Conner & Son knew when they gave their check to pay those drawn upon them, that it would be paid in Confederate money. The testimony in the record renders it clear beyond a reasonable doubt that the so-called Confederate money was the exclusive, the only currency at that time in New Orleans. All business operations were carried on in that currency. Nobody expected to pay or be paid in any other money. The president of the Bank of New Orleans at that time testifies that from the time of the suspension of specie payments, sixteenth of September, 1861, the banks of New Orleans, including that of which he was president, received and paid out Confederate notes—all other notes, he adds, gradually disappeared from circulation; that on the first day of January, 1862, payments in the Bank of New Orleans were made in Confederate money. That it was then universally used in the payment of debts due to banks; that it was universally recognized in New Orleans as money; that it was bankable; that it was generally known and understood among the dealers of the Bank of New Orleans that checks on it would be paid in Confederate money; that notices were placed by the bank in the bank books of depositors that checks on it would be paid in Confederate money, and that that was the general understanding.

Another witness, a director of the same bank at the time referred to, corroborates the statement of the president in regard to the notices given to depositors, and says that the instructions to the officers of the bank were to give notice in all cases to depositors that the bank would pay checks on it in Confederate money, and that depositors would be required to receive the same currency deposited by them. He states that by the twenty-fifth of February, 1862, every bank in New Orleans had given the same notices. His testimony is to the same effect as that of the president as to the exclusive and universal circulation of Confederate money in New Orleans at that period.

Another witness, at the time in view, a note clerk of the Bank of New Orleans, and subsequently cashier of the bank, corroborates fully the testimony of the director. He says that the firm of James Erwin & Son never had any transaction with the Bank of New Orleans, except the solitary one out of which this suit has arisen. He shows that the funds placed by the bank to the credit of the Erwins were Confederate money, that the twenty thousand dollars deposited in

court (meaning the Confederate money to the credit of James Erwin & Son), he found in the Bank of New Orleans when he took charge of its funds.

Other witnesses confirm to a great extent the testimony we have detailed. All the witnesses concur in declaring the universality of the use at that time in New Orleans of Confederate money. They establish most conclusively that it was the only currency; that it entered into all commercial operations, that by it alone all banking business was carried on; all deposits made in all the banks were made in Confederate money. All money paid out by the banks was Confederate money; in short that every kind of trade, occupation and business carried on, used Confederate money as a medium of exchange. Finally that every species of negotiation whatever entering into the mercantile pursuits of the time and into the every day pursuits of life was performed through Confederate money as the sole medium of exchange, because the business purposes of the community could not otherwise have been accomplished.

It is in proof distinctly that at the time the Erwins bought the checks from the Nashville banks, Confederate money was bankable in Nashville, and it is also fully established that they gave for those checks either Confederate money or bank notes of Tennsssee banks in good credit. It is a matter of history that at the period of these transactions specie payments were every where suspended throughout the so-called Confederate States. From the broad array of evidence spread out in the record we think the following deductions are legitimate and leave no reasonable doubt upon the mind and conscience of their truth. That the large sum forming the object of the adventure and the mode of the negotiation, imply that the Erwins were capitalists, conversant with money transactions, acquainted with the state of exchange and having a competent knowledge of the character and condition of the currency and of the banking operations going on at the time within the large range of their business.

That they paid for the checks they forwarded for collection to New Orleans either in Confederate money or in the notes of Tennessee banks, which nothing warrants us in believing were then in any better credit than Confederate money. Hence it results, that the probability is just as strong that they used Confederate money in the purchase of the checks as that they did not. That their implied knowledge of the course of trade and business at that day, negative the idea that they were ignorant of the kind of money the Bank of New Orleans was receiving and paying out at the time they forwarded their checks to that Bank, and this without any notice to that effect from the bank, although the evidence raises at least, a reasonable probability that they had such notice from the Bank. That under the existing state of facts, of which the inference is not admissible that they were ignorant, they tacitly and impliedly assented to receive in payment of their checks Confederate money, because Confederate money at that time

constituted bankable funds in New Orleans. This deduction derives greater force from the fact that they gave no instructions whatever as to what kind of money they expected or required in payment of their checks.

That when they received the letter from the cashier of the Bank of New Orleans, saying: "I am this day in receipt of your favors of the sixteenth and twenty-third inst., with $20,000, say twenty thousand dollars, and which as requested have been placed to the credit of James Erwin & Son," they neither expected nor had they a right to expect that they would receive the twenty thousand dollars in anything but Confederate money.

That the force of the aggregate testimony in the record is such as to leave no reasonable doubt upon the mind of the complicity of the Erwins in these transactions in the illicit paper money called "Confederate money," and at this late day it would be against law and conscience to permit their executors to retrieve their losses from the ill omened currency by extorting from the coffers of the bank near thirty thousand dollars in legal currency.

That the Erwins chose to deal with those who were trading in an illegal paper currency and to accept their conditions. They were therefore in the matter of giving credit to that currency *particeps criminis* and entitled to no relief from this court, which has often announced that it will not entertain suits to enforce contracts reprobated by law and public policy.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be annulled, avoided and reversed. It is further ordered that this suit be dismissed, and that the plaintiffs and appellees pay costs in both courts.

Rehearing refused.